## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| CAROL CLARKSON, DAVE CLARKSON, PLEASANT BEACH MOBILE HOME RESORT LLC, and JENNIFER RIVARD, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. |
| v. | ) ) | JURY TRIAL DEMANDED |
| BOYCE HYDRO POWER, LLC; BOYCE HYDRO LLC;  BOYCE MICHIGAN, LLC; LEE W. MUELLER; THE MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES & ENERGY; THE MICHIGAN DEPARTMENT OF NATURAL  RESOURCES; and JOHN DOES 1-100, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Carol Clarkson, Dave Clarkson, Pleasant Beach Mobile Home

Resort LLC, and Jennifer Rivard ("Plaintiffs"), by and through their attorneys, for

their Class Action Complaint against Defendants Boyce Hydro Power, LLC;

Boyce Hydro LLC;  Boyce Michigan, LLC; Lee W. Mueller (collectively, The

"Owner/Operator Defendants"); Defendants The Michigan Department Of

Environment, Great Lakes & Energy, and The Michigan Department Of Natural

Resources (collectively, the "State Defendants"), and John Does 1-100 (the

Owner/Operator Defendants, State Defendants, and John Doe Defendants may collectively be referred to as the "Defendants"), allege as follows:

## I.   INTRODUCTION

1.      Plaintiffs and the putative class live or own property near four 100-year-old major dams on the Tittabawassee River in the State of Michigan. They had no reason to believe that doing so put their lives or property at risk. Rather, any objective person would reasonably expect that the dams' owners and operators, including the Owner/Operator Defendants, and the regulators overseeing them, including the State Defendants, would comply with all existing laws and regulations and the standard of care.

2.      Yet, from at least August 6, 1993 until September 24, 2018, the Federal Energy Regulatory Commission ("FERC" or the "Commission") had repeatedly, in a series of communications with and orders to the Owner/Operator Defendants, emphasized the potentially unsafe condition of at least one of the fours – the  Edenville Dam, a 95-year-old high-hazard earthen embankment structure.

3.      Specifically, FERC expressed its concerns about the risk of catastrophic erosion from overtopping due to inadequate spillway capacity (i.e., only approximately 50% of the federally mandated Probable Maximum Flood ("PMF") standard, explained *infra*).

4.      In general, an auxiliary spillway activates after the existing dam flood

gates are open and water flow exceeds the capacity of current flood gate capability. FERC requires this spillway to significantly minimize the risk of the dam washing out during an extreme flood event.

5.    FERC further assigned the Edenville Dam a high hazard potential rating, because its failure, or negligent operation, could pose a significant risk to the Village of Sanford, Northwood University, the City of Midland, and other downstream areas, and stated on several occasions:

> Given Edenville dam's high hazard potential rating, the potential loss of life and destruction of property and infrastructure is grave should the project not be maintained and operated appropriately, with consequences that could certainly affect the Village of Sanford, Northwood University, City of Midland, Michigan, and other areas downstream.

6.    Moreover, the Secord Dam – also owned and operated by Boyce – does not have adequate spillway capacity to meet federal regulations.[1]

7.    Yet, despite repeated promises to fulfill their obligations as owners and under their licenses to operate the dams, the Owner/Operator Defendants knowingly and willfully refused to comply with major aspects of their licenses and FERC's regulatory regime, with the result that public safety was put at risk. Moreover, according to FERC, the Owner/Operator Defendants "displayed a

---

[1] http://www.four-lakes-taskforce-mi.com/updates (last accessed May 22, 2020).

history of obfuscation and outright disregard of [their] obligations."

8.     After the Owner/Operator Defendants' license to operate the Edenville Project was revoked in September 2018 by FERC, oversight was transferred to the State Defendants.

9.     The State Defendants knew of the high risks caused by the deterioration of and inadequate spillways at the Edenville Dam.

10.    Shortly after the State Defendants became responsible for oversight of the dam, dam safety engineers sent the State Defendants a memorandum, explaining that the State requires all high hazard dams to be capable of "safely passing the ½ PMF. Since the dam was designed and constructed prior to the time of FERC and [State] regulation, the original design did not consider present day design capacity requirements."  The memorandum concluded: "At this point in time, based on the documents reviewed, [we] do[] not believe that the Edenville Dam can be operated to meet the [State] dam safety requirement to pass the ½ PMF without certain repairs and improvements."

11.    Rather than heed the warnings of years of inspections and warnings from FERC, or the recent engineering opinions, the State Defendants opposed or delayed interim measures previously approved by FERC to reduce the risk of flooding, including repairs to the Edenville Dam, because of the concern for freshwater mussels and fish.

12.     The Owner/Operator Defendants' willful noncompliance with FERC directives and their failure to operate, fix, or repair the Edenville Dam as required by the standard of care has resulted in catastrophic injury and damage to the bodies and property of Plaintiffs and the Class.

13.     Moreover, the State Defendants' knowing opposition to and or delay of measures to reduce to the risk of flooding at the Edenville Dam as required by the standard of care has contributed to the catastrophic events that have occurred in May 2020.

14.     After several days of rain in May 2020, the Secord Dam was breached as a result of the Owner/Operator Defendants' actions. Then, the Edenville Dam collapsed, as a direct result of Defendants' actions. Moreover, as a result of the Edenville Dam collapse, the waters breached the Sanford Dam located downstream. The failures of these dams have caused severe flooding in the Midland, Michigan area, caused the draining of Wixom Lake, and further untold risk and damage to Plaintiffs and the putative class members' persons and property.

15.     Plaintiffs and class members sustained personal injury, property damage, economic damage, and emotional injury as a result of Defendants' conduct, as described herein, and set forth in more detail below. Plaintiffs bring this action against the Defendants, individually and on behalf of the Class, for

injunctive relief, and to recover compensatory and punitive damages, and for any other remedies or relief allowed by law.

## II.   JURISDICTION

16.     The Court has diversity jurisdiction under 28 U.S.C. § 1332(d). The matter in controversy in this suit exceeds $5,000,000, exclusive of interest and costs. This is a class action in which at least one plaintiff is a citizen of the State of Michigan, and at least one defendant is a citizen of a different state—in particular, Lee W. Mueller is a citizen of the State of Nevada.

17.     The Court has personal jurisdiction over the Owner/Operator Defendants because each of them has personally availed themselves of the benefits and protections of the State of Michigan. Each of the Owner/Operator Defendants conducted business and committed torts in Michigan, by themselves and their agents and/or alter egos, which caused Plaintiffs to suffer severe personal and property injuries in Michigan. As such, the Court has personal jurisdiction over the Owner/Operator Defendants pursuant to MCL 600.705 and MCL 600.715.

18.     The Court has personal jurisdiction over the State Defendants for committing torts within and that the affected property in the State of Michigan.

19.     Venue is proper in this Court because the original injury and damage occurred in the Eastern District of Michigan, the Defendants reside or conduct business in the Eastern District of Michigan, and Plaintiffs reside in the Eastern

District of Michigan.

### III.   PARTIES

20.     Plaintiff Pleasant Beach Mobile Home Resort LLC is a Michigan limited liability company with its principal place of business located at 4991 Wixom Dr., Beaverton, MI 48612. Dave Clarkson is the managing member of Pleasant Beach. Pleasant Beach is on the shores of Wixom Lake, and rents RV lots, vacation cabins and RVs, and boat slips on the lake. First, the breach of the Secord Dam resulted in flooding of Pleasant Beach grounds and cabins. Second, the collapse of the Edenville Dam drained Wixom Lake, and thus rendered Pleasant Beach's boat slips and position as a beach side park useless. The events have also caused a failure of power, lack of water, and no septic service. Defendants' actions which resulted in the breach of the Secord Dam and collapse of the Edenville Dam have impacted and will directly impact Pleasant Beach's business. As a result, Pleasant Beach has suffered and will suffer damages.

21.     Plaintiffs Carol Clarkson and Dave Clarkson are residents and citizens of Beaverton, Michigan. The breach of the Secord Dam caused flooding of one or more of their personal and rental homes and properties. Moreover, the collapse of the Edenville Dam and draining of Wixom Lake will cause the reduction in property values. As a result of Defendants' actions as described herein, Plaintiffs have suffered and will suffer damages.

22.     Plaintiff Jennifer Rivard is a resident and citizen of Midland, Michigan. Ms. Rivard resides downstream of the Edenville and Sanford Dams near Sturgeon Creek. The collapse of the Edenville Dam and breach of the Sanford Dam caused flooding of her home and property. As a result of Defendants' actions as described herein, Plaintiff has suffered and will suffer damages.

23.     Defendant Lee W. Mueller ("Mueller") is a resident and domiciliary of the State of Nevada. Since March 2007, he has served as the principal Co-Member Manager solely responsible for the operations of Defendants Boyce Hydro Power, LLC, Boyce Hydro, LLC, and Boyce Michigan, LLC.

24.     Defendant Boyce Hydro Power, LLC ("BHP") is a Michigan Limited Liability Company duly registered with the State of Michigan to conduct business in the State of Michigan. BHP holds Federal Energy Regulatory Commission ("FERC") licenses to operate hydroelectric dams located in Gladwin and Midland Counties in the State of Michigan. From July 12, 2007, through September 24, 2018, Plaintiff BHP held the FERC license to operate the Edenville Hydroelectric Project No. 10808 ("Edenville Project"), including the Edenville Dam which impounds the Wixom Reservoir located in Gladwin County, Michigan. Pursuant to Section 3(11) of the Federal Power Act (16 U.S.C. § 796(11)) and its FERC license, BHP, during the term of the Edenville Project FERC license, indirectly acquired and held sufficient rights to use all bottomlands located within the

boundaries of Edenville Hydroelectric Project No. 10808, including the

bottomlands of the impounded Wixom Reservoir and the bottomlands of the

Tittabawassee and Tobacco Rivers located upstream from the Edenville Project.

25.    Defendant Boyce Hydro LLC ("BH") is a Michigan Limited Liability

Company duly registered with the State of Michigan to conduct business in the

State of Michigan. BH operated the Edenville Project, on behalf of BHP, during

the term of BHP's FERC license for the project which ended on September 24,

2018. From September 25, 2018 to the present, BH has continued to operate the

Edenville Dam without regard to hydroelectric generation. Edenville Dam is a 95-

year-old embankment dam which the FERC had considered unsafe because of the

risk of catastrophic erosion from overtopping due to its allegedly inadequate

spillway capacity, and the high hazard potential rating it had been assigned (since

its failure or mis-operation could pose a significant risk to downstream

communities in Midland County, Michigan).

26.    Defendant Boyce Michigan, LLC ("BM") is a Michigan Limited

Liability Company duly registered with the State of Michigan to conduct business

in the State of Michigan. BM acquired and managed, on behalf of BHP, during the

term of BHP's FERC license for the Edenville Project, the Wixom Reservoir and

Tittabawassee and Tobacco River bottomlands falling within the boundaries of the

Edenville Hydro Project. Defendants BHP, BH and BM will hereafter be

collectively referred to as "Boyce".

27.     Wolverine Power Corporation ("Wolverine"), a dissolved corporation, was a Michigan corporation that originally held the FERC license to operate the Edenville Project.  Wolverine also owned the properties on which the Edenville Dam and other dams were located.

28.     A subsidiary of Synex Power, Inc., Synex Energy Resources Ltd. reportedly acquired the real estate assets of Wolverine, including the Edenville Project, in a foreclosure proceeding in 2003. Synex Energy Resources then transferred those real estate assets to a new subsidiary Synex Michigan, LLC.

29.     Synex Michigan, LLC acquired the operating business of Wolverine, including the purchase of Wolverine's remaining assets and the license to operate the Edenville Project from Wolverine on or about June 23, 2004.[2]

30.     On or about March 17, 2006, Boyce purchased 100 percent of the interests of Synex Michigan, LLC.

31.      Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC, and filed a statement with the Commission on July 12, 2007 to this effect.

32.     Defendant Michigan Department of Environment, Great Lakes and Energy ("EGLE"), known as the Michigan Department of Environmental Quality

---

[2] *See Wolverine Power Corporation and Synex Michigan, LLC*, 107 FERC ¶ 62,266 (2004).

("MDEQ") prior to an April 22, 2019 reorganization, is the state agency that is charged with protecting Michigan's environment and public health inter alia by managing water resources.

33.     The Water Resource Division ("WR") of EGLE ("EGLE-WR") is charged with ensuring Michigan's water resources remain clean and abundant inter alia by monitoring water quality, and the health of aquatic communities, developing policy, and protecting, restoring and conserving Michigan's inland lakes, streams and wetlands.

34.     The Dam Safety Unit of EGLE-WR ("EGLE-WR-DS") is responsible for ensuring the safety of Michigan's state-regulated dams. The EGLE-WR-DS program focuses on ensuring that dams are properly constructed, inspected, and maintained, and that the owners have adequately prepared for potential emergencies.

35.     On information and belief, the EGLE-WR-DS program has only two full-time staff members, plus one staff supervisor-hydrologist, dedicated to overseeing the regulation and safety of 1,061 dams within the State of Michigan, 89 of which bear a "high" hazard potential rating (as of 2018), and two-thirds of which have reached their  typical 50-year design life, with a program budget of approximately only $400,000.

## IV.    FACTS

### A. Background

#### 1.  Hydroelectric dams and spillway capacity

36.     A hydroelectric dam is one of the major components of a hydroelectric facility. A dam is a large, man-made structure built to contain a body of water. In addition to construction for the purpose of producing hydroelectric power, dams are created to control river flow and regulate flooding.

37.     Dams are retaining structures or structures that are built to create large standing bodies of water known as reservoirs. These reservoirs can be used for irrigation, electrical generation, or water supply.

38.     These dams are built on top of riverbeds and hold back water, raising the water level.

39.     A spillway is a structure constructed in a hydroelectric dam to provide a safe path for floodwaters to escape to some downstream area. Generally, the area that the spillway is released to is the river on which the hydroelectric dam was constructed.

40.     Spillways are an important functional part of a hydroelectric facility. If there is too much water going through the dam, elements like the turbines cannot function properly and can be damaged. Spillways protect these other parts from damage or complications.

41.     Every hydroelectric reservoir has a certain capacity or amount of

water it can hold. If the reservoir is already full but floodwaters enter the reservoir, the water level will increase, and this could result in the over-topping of the dam.

42.    Spillways are built to prevent this, as it allows some water to be drawn from the top of the reservoir to make room for the new water.

43.    When a reservoir is full, its water level will be equal to the height of the spillway. As soon as any excess water enters the reservoir, water will immediately start flowing out through the spillway.

44.    Regardless of the specific type of spillway, they generally consist of a control structure to hold back water, a channel for water to flow through, and a terminal structure.

## 2.  The Commission's Dam Safety Guidelines

45.    Inflow design flood (IDF) is the flood flow above which the incremental increase in water surface elevation due to failure of a dam or other water impounding structure is no longer considered to present an unacceptable threat to downstream life and property.

46.    IDF selection began primarily as a practical concern for protection of a dam and the benefits it provides.

47.    However, the early 1900s saw an increase in social awareness and laws designed to protect the public from certain high-risk activities.

48.    The same era witnessed an increase in the number and size of dams

built. When the "big dam" era began in the 1930s, safety clearly became a more dominant factor. It was recognized that dams needed to be designed to accommodate water flows that might be greater than the anticipated "normal" flow.

49.     Engineers began consulting with hydrometeorologists to determine if upper limits for rates of precipitation could be established on a rational basis by looking at, *inter alia,* the meteorology of storms that produced major floods in various parts of the country, large scale features of storms, measures of atmospheric moisture (such as dewpoint temperatures), and the rainfall depth-area-duration values produced by these storms.

50.     It was then possible to increase the storm dewpoint temperature and other factors affecting rainfall to the maximum appropriate values. This increase resulted in estimates of probable maximum precipitation (PMP), and thus introduced the concept of a physical upper limit to precipitation. When translated to runoff from a dam, the estimated flood flow is known as the probable maximum flood (PMF).

51.     Today, the PMF is generally accepted as the standard for the safety design of dams where the incremental consequences of failure have been determined to be unacceptable.

52.     In April 1977, President Carter issued a memorandum directing the

review of federal dam safety activities by an ad hoc panel of recognized experts.

53.    In June 1979, the ad hoc interagency committee on dam safety issued

its report, which contained the first guidelines for federal agency dam owners.

54.    With the passage of the National Dam Safety Program Act of 1996,

Public Law 104-303, ICODS and its Subcommittees were reorganized to reflect

the law's objectives and requirements, and the official Interagency Committee on

Dam Safety (ICODS) was formed.

55.    Today, the ICODS members include FEMA, the U.S. Army Corps of

Engineers, the U.S. Department of Energy, U.S. Nuclear Regulatory Commission,

U.S. Bureau of Reclamation, U.S. Department of Labor, and the National Weather

Service, among others.

56.    In 1998, the newly convened Guidelines Development Subcommittee

of the ICODS completed work on the update of the following guidelines: Federal

Guidelines for Dam Safety: Emergency Action Planning for Dam Owners; Federal

Guidelines for Dam Safety: Hazard Potential Classification System for Dams;

Federal Guidelines for Dam Safety: Earthquake Analyses and Design of Dams;

Federal Guidelines for Dam Safety: Selecting and Accommodating Inflow Design

Floods for Dams; and Federal Guidelines for Dam Safety: Glossary of Terms.

57.    The purpose of the Federal Guidelines for Dam Safety: Selecting and

Accommodating Inflow Design Floods for Dams, according to ICODS "is to

provide thorough and consistent procedures for selecting and accommodating

Inflow Design Floods (IDFs). The IDF is the flood flow above which the

incremental increase in water surface elevation downstream due to failure of a dam

or other water retaining structure is no longer considered to present an

unacceptable additional downstream threat."[3]

58.     The standard practice in the design of dams is to "to use the IDF that

is deemed appropriate for the hazard potential of the dam and reservoir, and to

design spillways and outlet works that are capable of safely accommodating the

floodflow without risking the loss of the dam or endangering areas downstream

from the dam to flows greater than the inflow."

59.     The upper limit of the IDF is the probable maximum flood (PMF).

The PMF event is the "flood that may be expected from the most severe

combination of critical meteorologic and hydrologic conditions that are reasonably

possible in the drainage basin under study."[4]

60.     The Commission's Dam Safety Guidelines "require the project works

to be designed to safely handle a flood up to the PMF either by withstanding

overtopping of the loading condition during such a flood or alleviating the risk

---

[3] FEMA, Federal Guidelines for Dam Safety: Selecting and Accommodating Inflow Design Floods for Dams (April 2004) ("IDF Guidelines"), at 1, available at https://www.ferc.gov/industries/hydropower/safety/guidelines/fema-94.pdf.

[4] IDF Guidelines, at 7.

such that dam failure would no longer constitute a hazard to downstream life or property. In the alternative, the capacity of the spillway must be adequate to prevent the reservoir from rising to an elevation that would endanger the safety of the project works."[5]

61.    According to the Commission, "[m]any dam owners have a difficult time believing that their dams could experience a rainfall many times greater than any they have witnessed over their lifetimes. Unfortunately, this attitude leads to a false sense of security because floods much greater than those experienced during any one person's lifetime can and do occur."

62.    Defendants fell into this category. For example, in 2018, Defendant Boyce Hydro argued in a FERC filing that the "odds of a 'probable maximum flood' event occurring in the next 5 to 10 years is 5 to 10 in one million." Defendants' willful negligence has resulted in the catastrophic dam breaches and flooding that recently occurred in Michigan.

### 3.  The Secord, Edenville, Sanford Dams

63.    On the Tittabawassee River in Michigan, there are four projects, each of which includes a dam, a reservoir, and a powerhouse that is integral to the dam.

64.    In existence since the 1920s, the four projects' reservoirs occupy

---

[5] *Boyce Hydro Power, LLC*, 2018 FERC LEXIS 1323, *3-4, 164 F.E.R.C. P61,178, 2018 WL 4350809 (F.E.R.C. September 10, 2018).

about 39 river miles on the Tittabawassee River, with the tailwater of each project being the headwater of the next downstream project.

65.     Beginning furthest downstream, the projects are the 3.3-megawatt (MW) Sanford Hydroelectric Project No. 2785, the 4.8-MW Edenville Project No. 10808, the 1.2-MW Smallwood Project No. 10810, and the 1.2-MW Secord Project No. 10809.

66.     Historically, the dam operator has drawn down the reservoirs from three to four feet in the late winter to maximize the benefits of winter generation and to minimize spilling during spring snowmelt run-off. The reservoirs are refilled to normal pool elevations before water temperatures reach levels that stimulate northern pike spawning.

67.     The Secord Project is located on the Tittabawassee River about 42 miles upstream from the City of Midland, Michigan.  The dam is located in Gladwin County approximately 8.5 miles northeast of the City of Gladwin.

68.     The Secord Dam consists of a concrete spillway and powerhouse with earthen natural embankments extending from either side of the spillway/powerhouse to natural ground.

69.     The top of the earth embankment is at elevation 757.8.  The reservoir is approximately 1,100 acres surface area at normal pool elevation of 750.8.  The normal tail water is 705.  The total length of the dam is about 2100 feet with the

concrete spillway and powerhouse comprising about 100 feet in length.

70. An aerial picture of the Secord Dam follows:



71. The Smallwood Reservoir is immediately downstream of the Secord Dam and has significant amount of development along its banks.

72. Due to inadequate spillways, among other issues, flooding at Secord usually occurs in the spring as the result of heavy spring rains or snow cover over ground in a fairly saturated condition. Major floods occurred on June 24, 2017, September 13, 1986, March 21, 1948, and June 3, 1943.[6]

73. The Edenville Project, which is one of the dams that are the subject of this lawsuit, is the second project as one travels upstream. The Edenville Project is

---

[6] https://gladwincounty-mi.gov/dam-information/ (last accessed May 22, 2020).

located just upstream of the point where the Tobacco River enters the Tittabawassee.

74.     The Edenville Project consists of earthen embankments, known as the Edenville dam, totaling about 6,600 feet in length and having a maximum height of 54.5 feet.

75.     The Edenville dam spans both the Tittabawassee and Tobacco Rivers creating a 2,600-acre reservoir known as Wixom Lake with a gross storage capacity of about 40,000 acre-feet and a 49-mile-long shoreline at full pool.

76.     There is a 50-foot-long intake leading to the powerhouse located at the dam on the eastern side of the project. The powerhouse contains two 2.4-megawatt (MW) Francis-type turbine generator units for a total installed capacity of 4.8 MW. The project creates a 0.4-mile-long bypassed reach on the Tobacco River that extends from the dam to the point where the Tobacco River meets the Tittabawassee River.

77.     Two reinforced concrete multiple arch spillways are present at the project. The 69-foot-wide and 39-foot-high Tittabawassee spillway (also referred to as the Edenville spillway) is located on the east side (Tittabawassee River side) of the project and contains three Tainter gates and two low-level sluice gates.

78.     The Tobacco spillway is about 72 feet long and 72 feet wide with a crest height of about 40 feet and contains three steel Tainter gates located on the

western side (Tobacco River side) of the project. Michigan State Highway 30 bisects both Wixom Lake and the project's dam.[7]

79.    Due to inadequate spillways, flooding at Edenville usually occurs in the spring as the result of heavy spring rains or snow cover over ground in a fairly saturated condition. Major floods occurred on June 24, 2017, September 13, 1986, March 21, 1948, March 8, 1946, and June 3, 1943.

80.    A picture of the Edenville dam in working condition follows:[8]



---

[7] *Boyce Hydro Power, LLC*, 159 F.E.R.C. P62,292, 64669, 2017 FERC LEXIS 735, *3-4 (F.E.R.C. June 15, 2017).

[8] https://www.cnn.com/2020/05/20/us/michigan-dam-failure-before-after-photos-trnd/index.html (last accessed May 21, 2020).

81.     The second dam that is the subject of this lawsuit, the Sanford Dam is the most downstream project, where the river flows 35 miles to its confluence with the Shiawassee, where they form the Saginaw River.

82.     Built in1925, Sanford Dam has a height of 36 feet, and a hydraulic head of 26 feet. The dam has a Michigan Department of Environmental Quality (MDEQ) high hazard rating due to the size of the dam and the development on and below the dam.

83.     Sanford Lake is a 1,250-acre impoundment of the Tittabawassee River created by the Sanford Dam.

84.      The Village of Sanford lies on the extreme southwest shore of the impoundment, near the impoundment's dam outlet. Sanford Impoundment is bisected by US10 at the southern end.

85.     A picture of the Sanford Dam in working condition follows:



86.     The location of the Edenville and Sanford dams is shown on the

following map:



## 4.  Ownership and Licensing of the Dams

87.     In 1976, the Commission determined that the Tittabawassee River is a

navigable waterway of the United States and that therefore the four projects are required to be licensed by Section 23(b)(1) of the Federal Power Act (FPA).

88.     In 1983, Wolverine Power Corporation filed its license application for the Sanford Project No. 2785, and in 1987 it was issued a license.

89.     On July 24, 1989, Wolverine filed license applications for its Edenville Project No. 10808, Smallwood Project No. 10810, and Secord Project No. 10809.

90.     On October 16, 1998, the Commission issued a license for the Edenville Project. The license includes terms and conditions concerning dam safety, property rights, water quality, public recreation and safety, and other areas of public concern.

91.     Wolverine transferred the licenses to Synex Michigan, LLC on June 23, 2004. See Wolverine Power Corporation and Synex Michigan, LLC, 107 FERC ¶ 62,266 (2004).

92.     Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC, and filed a statement with the Commission on July 12, 2007, to this effect.

**B. FERC repeatedly cited the Owner/Operator Defendants for their failure to address structural deterioration and insufficient spillway capacity at the Edenville Dam.**

**1. From 1993 to June 23, 2004, FERC warned Wolverine that the spillway capacity at the Edenville Dam did not pass the PMF.**

93.    Wolverine owned, and since 1926, had operated the four dams and hydroelectric projects at Sanford, Edenville, Smallwood and Secord.[9]

94.    In an August 6, 1993 letter from the Commission's Office of Energy Projects, Division of Dam Safety and Inspections, Chicago Regional Engineer ("Regional Engineer") to Wolverine, FERC advised that the spillway capacity of the Edenville Project did not meet the Commission's guidelines for passing the PMF.

95.    The "PMF event" is the flood that may be expected from the most severe combination of critical meteorologic and hydrologic conditions that are reasonably possible in the drainage basin under study.

96.    FERC's Regional Engineer repeatedly directed Wolverine to address the spillway capacity concerns at the project.

97.    On October 16, 1998, FERC issued a 30-year license for the Edenville Project to Wolverine.

98.    Standard Article 4 of the project license states:

---

[9] 51 FERC ¶ 63,012.

The project, including its operation and maintenance and
any work incidental to additions or alterations authorized
by the Commission, whether or not conducted upon lands
of the United States, shall be subject to the inspection and
supervision of the Regional Engineer, Federal Energy
Regulatory Commission, in the region wherein the
project is located, or of such other officer or agent as the
Commission may designate, who shall be the authorized
representative of the Commission for such purposes.
***The licensee shall comply with such rules and
regulations of general or special applicability as the
Commission may prescribe from time to time for the
protection of life, health, or property."[10]

99.     Section 12.35(b)(1) of the Commission's regulations states:

Specific inspection requirements

(b) Evaluation of spillway adequacy. The adequacy of
any spillway must be evaluated by considering hazard
potential which would result from failure of the project
works during flood flows.

(1) If structural failure would present a hazard to
human life or cause significant property damage, the
independent consultant must evaluate the ability of
project works to withstand the loading or overtopping
which may occur from a flood up to the probable
maximum flood or the capacity of spillways to prevent
the reservoir from rising to an elevation that would
endanger the project works.[11]

100.    In its order granting the license, FERC "address[ed], among other

matters, issues of pertinence to some or all of the four projects [including the

---

[10] *See Boyce Hydro Power, LLC*, 159 F.E.R.C. P62,292, 64669-64670, 2017
FERC LEXIS 735, *4-7 (F.E.R.C. June 15, 2017).
      [11] Id.

Edenville Dam], notably including mode of operation, fluctuation of reservoir levels, and fish entrainment."[12]

101.     Beginning in or about 1999, FERC notified Wolverine that it needed to increase capacity of the Edenville Dam's spillways to prevent a significant flood from overcoming the structure.

102.     On January 4, 1999, the Regional Engineer issued a letter to Wolverine, describing the Edenville Project's need to increase spillway capacity as the Commission's primary concern.

103.     Wolverine failed to immediately address this concern, requesting instead that it be given additional time to study the spillway capacity issue.

104.     On June 13, 2002, the Regional Engineer issued a letter requiring Wolverine to file, by July 31, 2002, a detailed plan and schedule for the completion of the spillway upgrades, and ordered Wolverine to complete the modifications to address the inadequate spillway capacity by December 31, 2006.[13]

105.     Wolverine failed to do so.

106.     Wolverine transferred the license to Synex Michigan, LLC on June

---

[12] *Wolverine Power Corp.*, 85 F.E.R.C. P61,063, 61205, 1998 FERC LEXIS 2058, *5 (F.E.R.C. October 16, 1998).
[13] *Boyce Hydro Power, LLC*, 2018 FERC LEXIS 1323, *5, 164 F.E.R.C. P61,178, 2018 WL 4350809 (F.E.R.C. September 10, 2018).

23, 2004.[14]

### 2. From June 23, 2004 to September 10, 2018, Boyce repeatedly and willfully flaunted FERC's directives to fix the insufficient spillway capacity at the Edenville Dam.

107.   At the time the license was transferred, FERC notified Synex (n/k/a Boyce) that it needed to increase capacity of the Edenville Dam's spillways to prevent a significant flood from overcoming the structure.

108.   As detailed in multiple orders, throughout its ownership of the project Boyce repeatedly failed to comply with its license for the Edenville Project, the Commission's regulations, and Commission orders, or to otherwise fix or maintain the Edenville Dam as required by the standard of care.[15]

109.   In a letter issued February 24, 2005, FERC's Regional Engineer noted that a PMF study was overdue even after Boyce received an extension of time to complete the necessary study. Further, FERC noted that Boyce's plan and schedule to complete auxiliary spillway work was also unacceptable.

---

[14] *See Wolverine Power Corporation and Synex Michigan, LLC*, 107 FERC ¶ 62,266 (2004).

[15] *See, e.g., Wolverine Power Corporation*, 85 FERC ¶ 61,063, at 61,205 (1998); *Boyce Hydro Power, LLC*, 159 FERC ¶ 62,292 (2017) (2017 Compliance Order); *Boyce Hydro Power, LLC*, 161 FERC ¶ 62,119 (2017) (Cease Generation Order), *reh'g denied*, 162 FERC ¶ 61,116 (2018) (Cease Generation Rehearing Order); *Boyce Hydro Power, LLC*, 162 FERC ¶ 61,115 (2018) (Order Proposing Revocation); *Boyce Hydro Power, LLC*, 164 FERC ¶ 61,178 (2018) (Revocation Order).

110.    For years, FERC staff worked with Boyce to increase the spillway capacity at the project needed to pass the PMF.

111.    For example, FERC held multiple meetings with Boyce, Commission staff, and a Board of Consultants to review and discuss plans for addressing spillway capacity, including on December 13-16, 2005; May 22-23, 2007; July 9-11, 2007; March 19-20, 2008; and February 4-5, 2009.

112.    Letters from FERC, including those issued by the Regional Engineer on August 6, 2011, March 5, 2014, and July 15, 2015, to Boyce "all state that the licensee's filings of designs, specifications, and plans over the years for the auxiliary spillway work were insufficient."

113.    On February 9, 2009, FERC's Regional Engineer granted Boyce an extension of time to construct the auxiliary spillways due to Boyce's inability to finance the work. This extension was based on Boyce's promise to complete the construction over a three-year period, instead of one, with construction to be completed in 2013.

114.    Later, after a series of letters dated September 30, 2013, October 9, 2013, and November 29, 2013, Boyce proposed to construct two auxiliary spillways, one in 2014 and one in 2015. However, Boyce never completed this work.

115.    After Boyce missed those deadlines, FERC's Regional Engineer then

proposed and required implementation of a new plan and deadline to construct one auxiliary spillway in 2015.

116.    Boyce did not meet this deadline either.

117.    A December 5, 2014 letter from the Regional Engineer formalized yet another timeline for completing the two auxiliary spillways with the Tobacco auxiliary spillway to be completed in 2015.

118.    This letter included a schedule with due dates for filing certain plans and specifications, monthly progress reports, and new construction deadlines.

119.    Under this schedule, an initial auxiliary spillway would be constructed by November 14, 2015 on the Tobacco side of the project, and the second auxiliary spillway would be constructed by December 31, 2016 on the Tittabawassee side of the project.

120.    Boyce failed to meet either of these new deadlines.

121.    By June 15, 2017, Boyce still had not filed or completed adequate plans for either auxiliary spillway.

122.    Boyce also failed to file a plan to pass the full PMF at the Edenville Project, despite numerous orders to do so.

123.    The need for Boyce to address the spillway capacity at the Edenville Project was also highlighted in a Part 12D Independent Consultant Safety Inspection Report, required by FERC's Engineering Guidelines for the Evaluation

of Hydropower Projects.  The report, filed with FERC by Boyce on March 22, 2016, highlighted that "the licensee should continue to work for review and approval of the existing spillway rehabilitation projects which will allow the dam to safely pass the 100% PMF."

124.    By June 2017, FERC issued a Compliance Order, after citing Boyce for violations of its license and the Commission's regulations for years for: "1) failing to increase the spillway capacity of the project; 2) performing unauthorized dam repairs; 3) performing unauthorized earth-moving activities; 4) failing to file an adequate Public Safety Plan; 5) failing to construct approved recreation facilities pursuant to the Commission's 2001 Order approving its Recreation Plan and for restricting public access; 6) failing to acquire all necessary project property rights; and 7) failing to comply with the Commission's 1999 Order approving its Water Quality Monitoring Plan."[16]

125.    In the Compliance Order, FERC made clear, however, that its "primary concern is the licensee's longstanding failure to address the project's inadequate spillway capacity. The Edenville dam has a high hazard potential rating, which means a failure of the project's works would create a threat to human life and/or would cause significant property damage. The project's spillway

---

[16] *Boyce Hydro Power, LLC*, 159 F.E.R.C. P62,292, 64669, 2017 FERC LEXIS 735, *1 (F.E.R.C. June 15, 2017).

deficiencies must be remedied."[17]

126.    FERC emphasized that Boyce's failures caused a "grave" risk for the

"potential loss of life and destruction of property and infrastructure":

> Given Edenville dam's high hazard potential rating, the
> potential loss of life and destruction of property and
> infrastructure is grave should the project not be
> maintained and operated appropriately, with
> consequences that could certainly affect the Village of
> Sanford, Northwood University, City of Midland,
> Michigan, and other areas downstream. The
> Commission's Dam Safety Guidelines require the project
> works to be designed to either withstand overtopping of
> the loading condition that would occur during a flood up
> to the probable maximum flood (PMF), or to the point
> where a failure would no longer constitute a hazard to
> downstream life and/or property. In the alternative, the
> capacity of the spillway must be adequate to prevent the
> reservoir from rising to an elevation that would endanger
> the safety of the project works. As summarized in an
> August 6, 1993 letter from the Regional Engineer to the
> prior licensee, the spillway capacity of the Edenville
> Project does not meet the Commission's guidelines for
> passing the PMF. The Regional Engineer has repeatedly
> directed the licensee to address the spillway capacity
> concerns at the project....[18]

127.    FERC noted that Boyce was not filing its required monthly progress

reports as to a plan for improvements to the auxiliary spillways

128.    FER also documented that Boyce was conducting unapproved and

---

[17] *Id.* at *2.
[18] *Boyce Hydro Power, LLC*, 159 F.E.R.C. P62,292, 64670, 2017 FERC
LEXIS 735, *7-9 (F.E.R.C. June 15, 2017).

inadequate repairs to the Edenville dam.

129.   Finally, in the Compliance Order, FERC found: "Thirteen years after acquiring the license for the project, the licensee has still not increased spillway capacity leaving the project in danger of a PMF event. The licensee has shown a pattern of delay and indifference to the potential consequences of this situation. A situation that must be remedied in order to protect life, limb, and property."[19]

130.   Citing the owner's "longstanding failure to address the project's inadequate spillway capacity at this high hazard dam," FERC held:

> The licensee is in violation of Article 4 for failing to follow
> directives from the Regional Engineer requiring the project to
> meet the Commission's guidelines for passing the PMF. The
> existing spillway capacity at the project is approximately 50%
> of the PMF. In working with the licensee, Commission staff
> identified certain risk reduction measures the licensee was
> required to implement in stages to increase spillway capacity
> until the full PMF can be passed. These risk reduction measures
> include the construction of auxiliary spillways on both the east
> and west sides of the project in proximity to the existing
> spillways to add additional hydraulic capacity. Given
> Commission staff's current assessment of what the licensee is
> developing, albeit based on inadequate plans and specifications
> as discussed in more detail below, after both risk reduction
> auxiliary spillways are constructed, the spillway capacity at the
> project would be increased to approximately 66% of the PMF.
> The licensee would therefore still need to implement additional
> measures to increase spillway capacity further. The licensee
> must also address the independent consultant's repeated
> recommendations to raise the minimum dam crest elevation by
> re-grading the embankments in certain locations which will also

---

[19] *Boyce Hydro Power, LLC*, 159 F.E.R.C. P62,292, 64671-64672, 2017 FERC LEXIS 735, *11-17 (F.E.R.C. June 15, 2017).

augment spillway capacity. However, the licensee has never
filed any specific plans and specifications to do so other than a
general schedule to complete this work by November 1, 2013 -
a schedule the licensee did not meet. The licensee's plans for
additional measures are unclear because the licensee has not
filed plans and specifications with the Commission despite the
Regional Engineer's directives to do so on multiple occasions.[20]

131.    On July 14, 2017 and July 27, 2017, Boyce filed two requests for

more time to comply with certain requirements in the Compliance Order.[21]

### 3. On November 10, 2017, FERC ordered Boyce to cease operations at the Edenville Project.

132.    On November 20, 2017, FERC issued a cease operation order to

Boyce for failing to comply with the following provisions of the Compliance

Order:

a.    Ordering paragraph (B), which provided in pertinent part: "For the

Tobacco Auxiliary Spillway: By July 15, 2017 (extended to

September 18, 2017), the licensee was required to file a complete

design package with the Commission's Division of Dam Safety and

Inspection, Chicago Regional Engineer (Regional Engineer) for a

Tobacco auxiliary spillway.

b.    Ordering paragraph (D), which provided in pertinent part: "For the

Tittabawassee Auxiliary Spillway: By August 14, 2017 (extended to

---

[20] Id. at *10-11.
[21] *Boyce Hydro Power, LLC*, 161 F.E.R.C. P62,119, 64244, 2017 FERC LEXIS 1604, *4 (F.E.R.C.
November 20, 2017).

November 14, 2017), the licensee was required to file with the
Regional Engineer, plans, specifications, and a schedule to construct a
Tittabawassee auxiliary spillway."

c.    Ordering paragraph (F), which provided: "By October 13, 2017
(extended to November 14, 2017), the licensee was required to file
with the Regional Engineer, a plan and schedule for additional
modifications to the project to meet the full (100%) Probable
Maximum Flood.

d.    Ordering paragraph (G), which provided in pertinent part: "By July
30, 2017 (extended to September 30, 2017), the licensee was required
to file with the Regional Engineer, complete plans and specifications
for permanent repairs to both left and right Tobacco abutment
spillway walls, a complete work schedule, detailed drawings, a water
management plan, an erosion control plan, a Temporary Construction
Emergency Action Plan, and a Quality Control Inspection Program as
originally specified in the Regional Engineer's letter to the licensee
issued December 8, 2016.[22]

---

[22] *Boyce Hydro Power, LLC*, 161 F.E.R.C. P62,119, 64244, 2017 FERC
LEXIS 1604, *5-8 (F.E.R.C. November 20, 2017).

133.    FERC also documented additional violations since the Compliance Order, which included: "The September 18, 2017 letter required the licensee to file a plan and schedule to perform a Focused Spillway Assessment pursuant to Article 4 of the license and directives issued by the Regional Engineer on April 28, 2017. This plan and schedule were due October 3, 2017. Neither of the above two plans and schedules have been filed with the Commission."

134.    As before, FERC noted that its "primary concern is the licensee's failure to address the project's inadequate spillway capacity."

135.    FERC thus ordered: "Boyce Hydro Power, LLC (licensee) must cease generation at the Edenville Hydroelectric Project by November 27, 2017. Generation must not resume until further order by the Commission."[23]

136.    In December 2017, Boyce provided photographs to FERC of the Edenville Dam, which showed that "the accumulation of large ice formations on the concrete sidewalls of the dam's spillways" posed a "significant and unacceptable structural hazard" "to the integrity of the dam's already compromised concrete civil structures."  Boyce also admitted that the gates on the Edenville Dam were defective.

137.    In a subsequent rehearing request, Boyce argued that the Cease Generation Order failed to consider its recent efforts to address the project's

_____

[23] *Id.*

spillway capacity, including the work of Gomez and Sullivan Engineers, PC which had purportedly completed nearly 800 hours of work on the Tobacco Auxiliary Spillway design package.[24]

138.   While Boyce Hydro claimed that it filed plans to complete geotechnical investigations with the Regional Engineer dated October 27, 2017, and November 22, 2017, the Regional Engineer issued letters to Boyce dated November 6, 2017, and December 22, 2017, finding these plans inadequate. Boyce Hydro then filed a third plan to complete this work, on January 15, 2018, which Commission staff approved by letter dated February 8, 2018.[25]

139.   After the Compliance Order was entered, and in response to FERC's proceedings to revoke its license, Boyce admitted that it failed to meet the obligations imposed by the Compliance Order.[26]

140.   As of February 15, 2018, Boyce claimed "to have started the process of preparing the design package for the Tobacco River Auxiliary Spillway," but requested an extension to finish.

141.   Boyce further claimed "that it lacks the funds to actually construct the

---

[24] *Boyce Hydro Power, LLC*, 162 F.E.R.C. P61,116, 61561, 2018 FERC LEXIS 216, *17 (F.E.R.C. February 15, 2018)
[25] *Id.*
[26] *Boyce Hydro Power, LLC*, 162 F.E.R.C. P61,115, 61557, 2018 FERC LEXIS 235, *10 (F.E.R.C. February 15, 2018) (*citing Boyce Hydro Power, LLC*, Docket Nos. P-10808-047 & -053, at 8-15 (Dec. 1, 2017)).

spillway and will need to save money over some unspecified period of time (and

resolve outstanding state permitting issues) before it can start construction. Of

course, this addresses just one of the two auxiliary spillways it must design and

construct and does not include the other modifications that it will need to make to

satisfy PMF requirements and/or to satisfy its obligations under the Compliance

Order."[27]

142.    In its 2018 request for rehearing, Boyce argued that the "odds of a

'probable maximum flood' event occurring in the next 5 to 10 years is 5 to 10 in

one million."

143.    FERC denied the rehearing request however, finding:

> Boyce Hydro's request to fund construction of the
> Tobacco Auxiliary Spillway with 50 percent of project
> revenues is inadequate. Based on its own cost estimate, it
> would take over two years for the licensee to fully fund
> the construction of the Tobacco Auxiliary spillway, and,
> in the absence of detailed plans and schedules, it is
> unclear whether the escrowed funds would be sufficient
> or how long construction would take. Further, the
> proposal fails to address how the licensee would fund,
> and when it would complete, the additional work needed
> at the project to comply with license requirements and
> other dam safety directives of the Regional Engineer,
> including the work that is needed at the Tittabawassee
> Auxiliary Spillway. Given that the public has already
> been at risk for more than 13 years due to the licensee's
> refusal to remediate the project spillways, we cannot
> accept a proposal that will perpetuate the problem even

---

[27] *Boyce Hydro Power, LLC*, 162 F.E.R.C. P61,115, 2018 FERC LEXIS 235
(F.E.R.C. February 15, 2018).

longer. Moreover, we note that Boyce Hydro offered in 2008 to set up an account for auxiliary spillway work in exchange for an extension of the deadline to complete that work. There is no evidence that the account was ever established and, in any case, the spillways have not been built.[28]

144.    FERC noted that Boyce admitted that it diverted revenues that could have been used to ameliorate dam safety risks at the Edenville Project to support other projects, which further undermined any contention that Boyce Hydro has diligently attempted to address issues at the Edenville Project.[29]

145.    FERC further held:

Last, Boyce Hydro's proposed schedule is not a workable solution. As has proved to be the case with respect to the licensee's filing of inadequate geotechnical plans (discussed above), non-specific schedules proposed by Boyce Hydro have historically led to further delays. We are thus left with too much uncertainty as to when spillway construction would actually be completed. In light of the licensee's long history of noncompliance, we do not find the public interest served by granting rehearing and allowing Boyce Hydro to resume generation.[30]

### 4. FERC revoked Boyce's license to operate the Edenville Project on September 10, 2018.

146.    On September 10, 2018, the Commission issued an order revoking Boyce's license for the project. According to the Commission: "Of particular

---

[28] Boyce Hydro Power, LLC , 162 F.E.R.C. P61,116, 61561, 2018 FERC LEXIS 216, *17 (F.E.R.C. February 15, 2018).

[29] Id., footnote 29.

[30] Id., *21-26.

concern has been the project's inability to pass the Probable Maximum Flood

(PMF) due to inadequate spillway capacity."

147.     The revocation of the license became effective on September 25,

2018.

148.     Boyce Hydro and the Sanford Lake Preservation Association (Sanford

Lake Association) sought rehearing of the Revocation Order, which the

Commission denied on January 17, 2019.

149.     On March 15, 2019, Boyce filed a motion requesting that the

Commission reconsider the revocation of the license for the Edenville Project and

approve the transfer of the license to Wolverine Hydro, LLC.[31]

150.     Denying the motion, FERC stated:

> We have previously concluded that 'Boyce Hydro has,
> for more than a decade, knowingly and willfully refused
> to comply with major aspects of its license and the
> Commission's regulatory regime, with the result that
> public safety has been put at risk and the public has been
> denied the benefits, particularly project recreation, to
> which it is entitled' and that '[t]he record demonstrates
> that there is no reason to believe that Boyce Hydro will
> come into compliance; rather, the licensee has displayed
> a history of obfuscation and outright disregard of its
> obligations.'

151.     FERC concluded: "An arrangement where Boyce Hydro, either itself

---

[31] *Boyce Hydro Power, LLC*, 167 F.E.R.C. P61,248, 2019 FERC LEXIS 932, 2019 WL 2563038 (F.E.R.C. June 20, 2019).

or through Boyce LLC, retains control over the operations and a portion of the assets of the project is not in the public interest and would not justify reinstatement of the license."[32]

152. On February 15, 2-018, FERC entered an order recommending Boyce's license be revoked. FERC stated: "The Commission's primary concern has been the licensee's longstanding failure to address the project's inadequate spillway capacity, which currently is designed to pass only approximately 50 percent of the PMF. Failure of the Edenville dam could result in the loss of human life and the destruction of property and infrastructure."[33]

### C. Similar to the Edenville Dam, the spillways at the Secord Dam are also not adequate to meet the PMF.

153. According to the Four Lakes Task Force, the Secord Dam does not meet the FERC Dam Safety standards.[34]

154. Secord Dam currently does not have adequate spillway capacity to meet federal regulations or Michigan state guidelines.

155. As of April 2020, the task force had stated that: "If generation of

---

[32] *Boyce Hydro Power, LLC*, 167 F.E.R.C. P61,248, 2019 FERC LEXIS 932, 2019 WL 2563038 (F.E.R.C. June 20, 2019).

[33] *Boyce Hydro Power, LLC*, 162 F.E.R.C. P61,115, 61555, 2018 FERC LEXIS 235, *4-5 (F.E.R.C. February 15, 2018)

[34] http://www.four-lakes-taskforce-mi.com/updates/secord-dam-preliminary-design-and-engineering-report-submitted-to-ferc (last accessed May 22, 2020).

hydro-electric power is to continue at the Secord Dam, additional spillway capacity must be constructed."

156.   In 2020, the Four Lakes Operations Company was coordinating with Boyce to prepare a submittal to FERC, which reportedly includes a Probable Maximum Flood (PMF) study and a preliminary design of a new auxiliary spillway. The new spillway is initially being considered on the eastern side of the dam.

157.   Moreover, if the FERC license is revoked, modifications and improvements to the dam will still be necessary to meet State of Michigan dam safety requirements.

> ### D. Despite an ample record of the inadequate conditions at the Edenville Dam which posed a grave risk to human life and property, the State Defendants put the protection of wildlife over the protection of human life and property.

158.   While Boyce's license to operate the dam was revoked on September 10, 2018, Boyce continued to own the Edenville Dam and thus still retained liability for its condition.

159.   Starting September 25, 2018 (i.e. after FERC revoked the license for Edenville Dam), the State Defendants assumed regulatory and enforcement jurisdiction over the operation of the Edenville Dam in its ongoing prevailing condition, "as it relate[d] to dam safety and environmental matters."

160.    However, during this period, none of the State Defendants took any action to address the deterioration of the Edenville Dam and insufficient spillway capacity.

161.    While under FERC licensure, the Edenville Dam had long been considered potentially unsafe to downstream communities because its inadequate spillway capacity had rendered it barely able to satisfy one-half of the FERC 100% PMF standard.

162.    Rather than give credence to the years of documented findings that the spillways at the Edenville Dam were not sufficient to withstand the PMF, the State Defendants declared the dam and its spillways were in "fair structural condition."

163.    An authority called the Four Lakes Task Force was then created by resolutions passed in Midland and Gladwin Counties to administer and oversee the maintenance and operations of the four dams and reservoir.

164.    The Task Force dam safety engineers issued a memorandum on September 18, 2019 to Lucas Trumble, P.E., purportedly one of only three personnel responsible for administering and enforcing the dam safety laws and regulations for the State Defendants. The memorandum summarized the gate tests that Boyce's dam safety engineer had previously performed in the presence of the FLTF's dam engineers at the Edenville Dam on June 14, 2019.

165.    The memorandum emphasized that "[t]he original Edenville

Hydroelectric project was designed with six radial gates to allow for normal operation and to release floodwaters when lake elevations begin to rise after a rainfall event. The […] (FERC) requires that all high hazard dams be capable of safely passing 100% of the Probable Maximum Flood (PMF). EGLE requires safely passing the ½ PMF. Since the dam was designed and constructed prior to the time of FERC and EGLE regulation, the original design did not consider present day design capacity requirements."

166.    The memorandum concluded: "At this point in time, based on the documents reviewed, the FLTF does not believe that the Edenville Dam can be operated to meet the EGLE dam safety requirement to pass the ½ PMF without certain repairs and improvements."

167.    Moreover, the dam safety engineers of the dam's prospective acquiror allegedly determined that the 95-year-old high hazard embankment dam would fail to meet even the State of Michigan's 50% PMF standard, in light of not only its historically inadequate spillway capacity, but also its old age and the poor condition of its critically important gates and hoisting equipment.

168.    Rather than heed the warnings of years of inspections and warnings from FERC, or the recent engineering opinions, MDNR allegedly sent a letter on October 2, 2019 to EGLE-WRD. The letter opposed interim measures previously approved by FERC to reduce the risk of flooding, including drawdowns of the

Wixom reservoir, because of the concern for freshwater mussels and fish.

169.     On November 20, 2019, Keto Gyekis, the Coordinator of EGLE-

WRD's Wetland Identification Program, allegedly submitted comments to MDNR

concerning proposed drawdowns of the Wixom reservoir to avoid or reduce the

risks of flooding. Gyekis reportedly wrote:

> Research has shown that […] large scale cold-season
> drawdowns within impoundments are often associated
> with negative ecological effects. Various biological,
> chemical, and physical changes within the littoral zone
> during a large-scale cold-season drawdown can indirectly
> affect ecological condition within the rest of the
> impoundment. […] A drawdown after the cold-season
> commences can expose […] hibernating animals to very
> cold dry air, where they can desiccate irreversibly.

170.     Gyekis allegedly further wrote:

> Rainbow mussel (Villosa iris), is a State-listed Special
> Concern species that is suspected to inhabit the upper end
> of the Tobacco River portion of the Wixom Lake where
> there is normally some lotic current. State/Federal mussel
> maps indicate that this species also likely inhabits more
> than a mile segment of the Tobacco River adjacent to the
> north end of the reservoir. Pertaining to this mussel
> species, Michigan Natural Features Inventory literature
> recommends that unnatural hydrological alterations be
> avoided. A significant winter drawdown could strand and
> kill individuals of this species and other native mussel
> species, primarily because they can not relocate (or be
> relocated) effectively. We do not support implementation
> of a winter drawdown.

171.     The State Defendants' focus was thus on the protection of wildlife,

rather than on the need for a drawdown of the Wixom reservoir to avoid flooding

downstream.

172.    The State Defendants' failure to analyze or determine whether the

Edenville Dam was potentially unsafe to downstream communities, especially if it

were to be operated during harsh winter weather conditions in the absence of a

winter Wixom Reservoir drawdown to ROR levels, was egregious in light of years'

of evidence from FERC and engineering experts.

### E. During the storms of May 2020, the Edenville Dam was breached, causing a breach at the Sanford Dam, emergency evacuations, and catastrophic damage.

173.    As a result of heavy rains, on Monday, May 18, 2020, high flows

were reportedly passing through Secord and Smallwood Dams on the

Tittabawassee River.

174.    The National Weather Service and Gladwin Count issued imminent

hazard flash flood warnings.

175.    In fact, due to inadequate spillways at the Secord Dam, flooding did

occur that caused substantial damage to Plaintiffs and the Class.

176.    As of 6 a.m. on May 19, 2020, the city of Midland had experienced

4.70 inches of rain in several days of storms.  The heavy rainfall was produced by

a condition that usually causes Michigan's biggest rains - tropical moisture.

Tropical Storm Arthur was churning off the Mid-Atlantic coast, while a belt of

moisture traveled from the East Coast westward into Michigan. The storm system

already in place over Michigan was able to tap into that tropical moisture and increase rainfall totals.

177.    The flooding that breached the Secord upstream combined with the inadequate condition of the Edenville Dam then caused a series of events that caused further damage.

178.    At approximately 5:45 p.m. on May 20, 2020, based on stills from videos of the events, it appears that first a small amount of water overtopped the Edenville dam.  Then, the crest of the embankments of the dam began to crumble, creating a large bulge and deformation:[35]



179.    The embankment then rapidly collapsed in a landslide:

---

[35] The still images are taken from a video posted at https://www.mlive.com/news/saginaw-bay-city/2020/05/video-shows-michigan-dam-break-as-it-happened-catastrophic-is-the-only-thing-i-can-call-it.html (last accessed May 21, 2020).



180.    The full breach of the Edenville Dam followed within seconds:



181.    Water quickly flooded the surrounding areas:[36]

---

[36] Still taken from https://www.youtube.com/watch?v=RQh7kIDvNLw (last accessed May 21, 2020).



182. The power of water flowing after the Edenville Dam broke completely washed away a road bridge roughly a mile downriver and virtually emptied Wixom Lake, a 2,600-acre reservoir created by the dam, by the next morning.

183. One hour later, at approximately 6:50 p.m. on May 20, 2020, the power of the water also caused a breach at Sanford Dam due to inadequate spillways and the collapse of the Edenville Dam.

184.    The following map illustrates the scope of damage projected to occur as a result of dam failures along the Tittabawassee River.  The city of Midland urged residents within the shaded areas to evacuate.



185.    According to the Midland County Hazard Mitigation Plan (MCHMP) from Nov. 2018, the most vulnerable jurisdictions for dam failure are as follows, ranking highest to lowest: Edenville Township, Jerome Township, Village of Sanford, Lincoln Township, Homer Township, City of Midland, Midland

Township, and Ingersoll Township.

186.     MCHMP also defines dam failure as "the collapse or failure of an impoundment resulting in downstream flooding." It states that, "Dam failures can result in loss of life and extensive property or natural resource damage for miles downstream from the dam. Failure of a dam does not only occur during flood events, which may cause overtopping of a dam. Failure can also result from poor operation, lack of maintenance and repair, and vandalism. Such failures can be catastrophic because they occur unexpectedly, with no time for evacuation."

187.     The flooding forced about 11,000 people to evacuate their homes in the Midland area, following what the National Weather Service called "catastrophic dam failures" at the Edenville Dam and the Sanford Dam.

188.     Homes were submerged throughout the affected area, including in the City of Midland where the water was so high that roofs of houses were barely visible in some parts.

189.     The floodwaters also mixed with containment ponds at a Dow Chemical Co. plant and could displace sediment from a downstream Superfund site.

190.     Thousands of people and entities have suffered significant property damage, and other damages, for which Defendants should be held responsible.

## V.   CLASS ALLEGATIONS

191.   Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2),

(b)(3) and (c)(4) on behalf of a proposed Class defined as follows: all individuals

and entities who suffered bodily injury or property damage from flooding resulting

from the collapse of the Edenville Dam in Michigan in May 2020.

192.   The number of class members is sufficiently numerous to make class

action status the most practical method for Plaintiffs to secure redress for injuries

sustained and to obtain class wide equitable injunctive relief.

193.   There are questions of law and fact raised by the named Plaintiffs'

claims common to those raised by the Class(es) they seek to represent. Such

common questions predominate over question affecting only individual members

of the Class(es).

194.   The violations of law and resulting harms alleged by the named

Plaintiffs are typical of the legal violations and harms suffered by all Class

members.

195.   Plaintiff Class representatives will fairly and adequately protect the

interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any

conflicts of interest between the Class representatives and absent Class members

with respect to the matters at issue in this litigation; the Class representatives will

vigorously prosecute the suit on behalf of the Class; and the Class representatives

are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving personal and property damage.

196. Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

197. The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

198. Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

## VI.   CAUSES OF ACTION

### COUNT I
### NEGLIGENCE – DEFECT
### (AGAINST THE OWNER/OPERATOR DEFENDANTS)

199. Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs as if fully set forth herein.

200. Section 803 of the Federal Power Act provides:

That the licensee shall maintain the project works in a
condition of repair adequate for the purposes of
navigation and for the efficient operation of said works in
the development and transmission of power, shall make
all necessary renewals and replacements, shall establish
and maintain adequate depreciation reserves for such
purposes, shall so maintain, and operate said works as not
to impair navigation, and shall conform to such rules and
regulations as the Commission may from time to time
prescribe for the protection of life, health, and property.
Each licensee hereunder shall be liable for all damages
occasioned to the property of others by the construction,
maintenance, or operation of the project works or of the
works appurtenant or accessory thereto, constructed
under the license and in no event shall the United States
be liable therefor.

16 U.S. Code § 803.

201.    The Owner/Operator Defendants owed Plaintiffs and the Class a duty

to exercise reasonable care.

202.    The duty of reasonable care in this case included the duty to:

a.    Maintain the Edenville Project in a condition of repair adequate for

the purposes of navigation and for the efficient operation of said

works in the development and transmission of power;

b.    Make all necessary renewals and replacements of the infrastructure of

the Edenville Project;

c.    Establish and maintain adequate depreciation reserves for such

purposes;

d.    Conform to such rules and regulations as the Commission may from

time to time prescribe for the protection of life, health, and property;

e. Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF);

f. Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the point where a failure would no longer constitute a hazard to downstream life and/or property;

g. Increase the inadequate spillway capacity of the Edenville Project and Edenville Dam; and

h. Mitigate the threat to human life and risk of significant property damage as a result of the inadequate spillway capacity of the Edenville Project.

203. The Owner/Operator Defendants breached that duty by failing to:

a. Maintain the Edenville Project in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power;

b. Make all necessary renewals and replacements of the infrastructure of the Edenville Project;

c. Establish and maintain adequate depreciation reserves for such

purposes;

d.  Conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property;

e.  Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF);

f.  Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the point where a failure would no longer constitute a hazard to downstream life and/or property;

g.  Increase the inadequate spillway capacity of the Edenville Project;

h.  Mitigate the threat to human life and risk of significant property damage as a result of the inadequate spillway capacity of the Edenville Project.

204.  The Owner/Operator Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy the inadequate IDF or spillways despite repeated warnings from the Commission.

205.  As a result of The Owner/Operator Defendants' breaches of their duty to design, construct, and maintain the Edenville Project and Dam, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial

measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to remediate the effects of the collapse of the Edenville Dam as a result of the Owner/Operator Defendants negligence for many years into the future.

206. The Owner/Operator Defendants negligently breached their duties to the Plaintiffs and the Class to ensure that the Edenville Dam was able withstand the PMF so as to prevent the destruction of life and limb from storms and flood waters in the business, homes and rental properties of Plaintiffs and Class Members.

207. The Owner/Operator Defendants willfully and wantonly breached their legal duties despite full knowledge of the extent of the structural deterioration and inadequate spillways at the Edenville Dam, and the threat these issues posed to human health and safety and to property.

208. As a direct and proximate result of the Defendants' actions and/or omissions, as alleged in this Complaint, Plaintiffs have suffered extensive damages, past, present, and future, including, but not limited to:

a.     Serious bodily injury;

b.     Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

c.      Extensive property damage and/or destruction;

d.      Pain and suffering;

e.      Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

## COUNT II
## NEGLIGENCE – FAILURE TO WARN
## (AGAINST THE OWNER/OPERATOR DEFENDANTS)

209.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs as if fully set forth herein.

210.    The Owner/Operator Defendants owed Plaintiffs and the Class a duty to exercise reasonable care.

211.    The duty of reasonable care in this case included the duty to:

a.      Maintain the Edenville Project in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power;

b.      Make all necessary renewals and replacements of the infrastructure of the Edenville Project;

c.      Establish and maintain adequate depreciation reserves for such purposes;

d.      Conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property;

e.   Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF);

f.   Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the point where a failure would no longer constitute a hazard to downstream life and/or property;

g.   Increase the inadequate spillway capacity of the Edenville Project and Edenville Dam; and

h.   Mitigate the threat to human life and risk of significant property damage as a result of the inadequate spillway capacity of the Edenville Project.

212.   The Owner/Operator Defendants breached that duty by failing to:

a.   Maintain the Edenville Project in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power;

b.   Make all necessary renewals and replacements of the infrastructure of the Edenville Project;

c.   Establish and maintain adequate depreciation reserves for such purposes;

d.    Conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property;

e.    Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF);

f.    Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the point where a failure would no longer constitute a hazard to downstream life and/or property;

g.    Increase the inadequate spillway capacity of the Edenville Project;

h.    Mitigate the threat to human life and risk of significant property damage as a result of  the inadequate spillway capacity of the Edenville Project.

213.    The Owner/Operator Defendants further breached that duty by failing to timely notify the Plaintiffs and the Class of the serious structural deterioration of the Edenville Dam, the failure to construct adequate spillways, and the "grave risk" of collapse and flooding that could result in loss of life and property of Plaintiffs and the Class.

214.    As a result of the Owner/Operator Defendants' breaches of their duty to timely notify them of the dangers, Plaintiffs and the Class were forestalled from

undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to fix or replace damaged property, as well as to restore lost business.

215.     The Owner/Operator Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy the inadequate IDF or spillways despite repeated warnings from the Commission.

216.     As a result of the Owner/Operator Defendants' breaches of their duty to warn, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to remediate the effects of the breaches of the Dams as results of Defendants' negligence for many years into the future.

217.     The Owner/Operator Defendants negligently breached their duties to warn Plaintiffs and the Class of their failure to ensure that the Edenville Dam was able withstand the PMF so as to prevent the destruction of life and limb from storms and flood waters in the business, homes and rental properties of Plaintiffs and Class Members.

218.     The Owner/Operator Defendants willfully and wantonly breached their duties to warn Plaintiffs and the Class of their failure to ensure that the Edenville Dam was able withstand the PMF so as to prevent the destruction of life

and limb from storms and flood waters in the business, homes and rental properties of Plaintiffs and Class Members.

219.    As a direct and proximate result of the Defendants' actions and/or omissions, as alleged in this Complaint, Plaintiffs have suffered extensive damages, past, present, and future, including, but not limited to:

a.    Serious bodily injury;

b.    Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

c.    Extensive property damage and/or destruction;

d.    Pain and suffering;

e.    Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

### COUNT III
### GROSS NEGLIGENCE
### (AGAINST THE OWNER/OPERATOR DEFENDANTS)

220.    Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

221.    The Owner/Operator Defendants owed Plaintiffs and the Class a duty to exercise reasonable care. The Owner/Operator Defendants owed Plaintiffs and the Class a duty to act reasonably to fix the IDF and inadequate spillways before

their failure injured Plaintiffs, the Class, and their property.

222.    As alleged herein, the Owner/Operator Defendants, individually and collectively, caused the Edenville Project and Dam to be maintained and operated in contravention of federal statutes and guidelines. As such, the Owner/Operator Defendants grossly, negligently, recklessly, willfully, wantonly, and/or intentionally caused the collapse of the Edenville Dam which caused floodwaters to submerge and damage the real property of Plaintiffs and the Class.

223.    The Owner/Operator Defendants owed Plaintiffs and the Class a duty to act with reasonable care in undertaking their obligations. As professionals in the operation and maintenance of hydroelectric projects, the Owner/Operator Defendants had a duty to act as an engineer of ordinary learning, judgment, or skill would. As more fully described herein, the Owner/Operator Defendants breached their duties of care by failing to:

a.    Maintain the Edenville Project in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power;

b.    Make all necessary renewals and replacements of the infrastructure of the Edenville Project;

c.    Establish and maintain adequate depreciation reserves for such purposes;

  d.  Conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property;

  e.  Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF);

  f.  Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur during a flood up to the point where a failure would no longer constitute a hazard to downstream life and/or property;

  g.  Increase the inadequate spillway capacity of the Edenville Project;

  h.  Mitigate the threat to human life and risk of significant property damage as a result of the inadequate spillway capacity of the Edenville Project.

224. Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs or the Class.

225. As a direct and proximate result of the Owner/Operator Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present, and future, including, but not limited to:

  a.  Serious bodily injury;

b.      Substantial economic losses from medical expenses, lost wages, lost

income, lost or impaired earning capacity, lost business profits, and

reduced property values, among others;

c.      Extensive property damage and/or destruction;

d.      Pain and suffering;

e.      Embarrassment, outrage, mental anguish, fear and mortification,

denial of social pleasures, and stress related physical symptoms.

## COUNT IV
## COMMON LAW TRESPASS
## (AGAINST THE OWNER/OPERATOR DEFENDANTS)

226.    Plaintiffs and Plaintiff Class incorporate by reference the allegations

set forth in all foregoing paragraphs, as if fully set forth herein.

227.    Common law trespass is the unauthorized direct or immediate

intrusion of a physical, tangible object onto land over which the plaintiff has a right

of exclusive possession.

228.    The diversion of water may effect an intrusion onto land.

229.     A direct or immediate invasion for purposes of trespass is one that is

accomplished by any means that the offender knew or reasonably should have

known would result in the physical invasion of the plaintiff's land.

230.    As alleged herein, the Owner/Operator Defendants, individually and

collectively, caused the Edenville Project and Dam to be maintained and operated

in contravention of federal statutes and guidelines. As such, the Owner/Operator

Defendants knew or reasonably should have known that the Edenville Dam could

not withstand the PMF, which would result in floodwaters invading the land of

Plaintiffs and the Class.

231.    As a direct and proximate result of the Owner/Operator Defendants'

actions and/or omissions, as alleged in this Consolidated Amended Complaint,

Plaintiffs have suffered damages.

## COUNT V
## STATUTORY TRESPASS – VIOLATION OF MCL 600.2919(1)
## (AGAINST THE OWNER/OPERATOR DEFENDANTS)

232.    Plaintiffs and Plaintiff Class incorporate by reference the allegations

set forth in all foregoing paragraphs, as if fully set forth herein.

233.    MCL 600.2919(1) provides in relevant part:

Any person who:

(a) cuts down or carries off any wood, underwood, trees,
or timber or despoils or injures any trees on another's
lands, or

(b) digs up or carries away stone, ore, gravel, clay, sand,
turf, or mould or any root, fruit, or plant from another's
lands, or

(c) cuts down or carries away any grass, hay, or any kind
of grain from another's lands without the permission of
the owner of the lands, or on the lands or commons of
any city, township, village, or other public corporation
without license to do so, is liable to the owner of the land
or the public corporation for 3 times the amount of actual
damages.

234.    As alleged herein, the Owner/Operator Defendants, individually and collectively, caused the Edenville Project and Dam to be maintained and operated in contravention of federal statutes and guidelines, and the standard of care.

235.    As such, the Owner/Operator Defendants knew or reasonably should have known that the Edenville Dam could not withstand the PMF, which would result in floodwaters invading the land of Plaintiffs and the Class.

236.    As a direct and proximate result of the Owner/Operator Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered damages and are entitled to recover three times the amount of actual damages.

## COUNT VI
## TRESPASS-NUISANCE
## (AGAINST THE STATE DEFENDANTS)

237.    Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

238.    Trespass-nuisance includes the interference with the use or enjoyment of land caused by a physical intrusion that is set in motion by the government or its agents and resulting in personal or property damage.

239.    After FERC revoked Boyce's license on September 10, 2018, the State Defendants assumed regulatory and enforcement jurisdiction over the operation of the Edenville Dam in its ongoing prevailing condition, "as it relate[d]

to dam safety and environmental matters."

240.    While under FERC licensure, the Edenville Dam had long been considered unsafe to downstream communities because its inadequate spillway capacity had rendered it barely able to satisfy one-half of the FERC 100% PMF standard.

241.    FERC's regulatory filings and concerns were known or should have been known to the State Defendants.

242.    Rather than give credence to the years of documented findings that the spillways at the Edenville Dam were not sufficient to withstand the PMF and without a full engineering analysis of the dam, the State Defendants declared the dam and its spillways in "fair structural condition."

243.    Moreover, the Four Lakes Task Force dam safety engineers issued a memorandum on September 18, 2019 to the State Defendants, which provided that "The […] (FERC) requires that all high hazard dams be capable of safely passing 100% of the Probable Maximum Flood (PMF). EGLE requires safely passing the ½ PMF. Since the dam was designed and constructed prior to the time of FERC and EGLE regulation, the original design did not consider present day design capacity requirements."

244.    The memorandum concluded: "At this point in time, based on the documents reviewed, the FLTF does not believe that the Edenville Dam can be

operated to meet the EGLE dam safety requirement to pass the ½ PMF without certain repairs and improvements."

245.    Rather than heed the warnings of years of inspections and warnings from FERC, or the recent engineering opinions from FLTF, the State Defendants opposed interim measures previously approved by FERC to reduce the risk of flooding, including drawdowns of the Wixom reservoir, because of the concern for freshwater mussels and fish.

246.    The State Defendants' focus was thus on the protection of wildlife, rather than on the need to:

a.    Maintain the Edenville Project in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power;

b.    Make all necessary renewals and replacements of the infrastructure of the Edenville Project;

c.    Establish and maintain adequate depreciation reserves for such purposes;

d.    Conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property;

e.    Design, fix, or maintain the Edenville Project and Edenville Dam to withstand overtopping of the loading condition that would occur

during a flood up to the probable maximum flood (PMF);

f.       Design, fix, or maintain the Edenville Project and Edenville Dam to
withstand overtopping of the loading condition that would occur
during a flood up to the point where a failure would no longer
constitute a hazard to downstream life and/or property;

g.       Increase the inadequate spillway capacity of the Edenville Project;

h.       Mitigate the threat to human life and risk of significant property
damage as a result of the inadequate spillway capacity of the
Edenville Project.

247.     The State Defendants' failure to analyze or determine whether the
Edenville Dam was potentially unsafe to downstream communities, especially if it
were to be operated during harsh winter weather conditions in the absence of a
winter Wixom Reservoir drawdown, was egregious in light of years' of evidence
from FERC and engineering experts.

248.     The State Defendants' purposeful decision not to require Boyce to fix
the IDF and inadequate spillways resulted in the structural collapse of the
Edenville Dam and catastrophic flooding which interfered, and continues to
interfere, with the use or enjoyment of land by Plaintiffs and the Class.

249.     As a direct and proximate result of the Owner/Operator Defendants'
actions and/or omissions, as alleged in this Consolidated Amended Complaint,

Plaintiffs have suffered extensive damages, past, present, and future, including, but not limited to:

    a.  Substantial economic losses from lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others; and

    b.  Extensive property damage and/or destruction;

    c.  Any other damages or remedies allowed by law.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant their request to proceed as a class action; appoint Plaintiffs as the Class Representatives and their counsel as Class Counsel; enter judgment against the Defendants; award compensatory, punitive, and statutory damages and any other damages allowed by law; and grant such other and further relief as this Court deems appropriate.

Dated: May 22, 2020        FEGAN SCOTT LLC

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Emily Peacock
OLSMAN MUELLER WALLACE &
MACKENZIE, P.C.
2684 West Eleven Mile Road

Berkley, MI  48072
Ph. (248) 591-2300
Fax (248) 591-2304
epeacock@olsmanlaw.com

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: May 22, 2020

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com